IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

TRAVELERS INDEMNITY COMPANY
OF CONNECTICUT, et al.

    Plaintiffs,                  No. 2:11-cv-1601 JAM CKD

    vs.

ARCH SPECIALTY INSURANCE
COMPANY,
                                ORDER

    Defendant.

_____/

        In this diversity action, originally filed on June 13, 2011, defendant and cross-complainant Arch Specialty Insurance Company ("Arch"), an excess insurer, seeks reimbursement through subrogation of over $20 million that Arch paid to settle an underlying personal injury action, which Arch contends was handled in bad faith by the primary insurers, plaintiffs and cross-defendants Travelers Indemnity Company of Connecticut and Travelers Property Casualty Company of America (collectively, "Travelers").[1]

        Before the court is Arch's motion for a protective order (dkt. no. 31), which came on regularly for hearing on June 6, 2012. Aaron Allan appeared on behalf of Arch and John

---

[1] Travelers, as plaintiffs, originally commenced this action seeking declaratory relief as to this controversy, and Arch subsequently filed counterclaims.

1

Brooks appeared on behalf of Travelers. After considering the parties' joint statement and supporting documentation, the arguments of counsel, and the applicable law, the court now issues the following order.

BACKGROUND

Facts Giving Rise to the Litigation

Travelers issued liability insurance policies to Freeway Transport, Inc. ("Freeway Transport") and its affiliate United Salad Co. ("United Salad") with a combined limit of $2 million dollars for the period of September 1, 2004 through September 1, 2005. Arch issued an excess liability policy to Freeway Transport and United Salad for that same period providing $24 million in excess coverage above the $2 million combined limit of the Travelers policies. During the covered period, on November 24, 2004, a nine-year old girl was severely injured in Northern California when she was tragically run over by her father in a semi-tractor-trailer on a trucking job that had been arranged by Freeway Transport to deliver a load of produce to United Salad in Portland, Oregon. Freeway Transport is a transportation logistics company that apparently owns no trucks of its own. Thus, Freeway Transport had arranged for the girl's father, a licensed interstate trucker, to haul the load.

Subsequently, in 2006, Freeway Transport was sued in Sacramento County Superior Court in a case entitled <u>Malaquias Mejia as guardian ad litem for Diana Yuleidy Loza-Jimenez v. Loza Trucking, et al.</u> (the "Mejia Action"). The Mejia Action sought damages for the injuries suffered by the girl as a result of the November 2004 accident. As the primary insurer, Travelers accepted tender of the defense and appointed counsel to represent Freeway Transport. Because Freeway Transport itself was not negligent in causing the accident, the primary theory of recovery against Freeway Transport in the Mejia Action was vicarious liability based on a non-delegable duty owed by Freeway Transport to the injured girl. Whether Freeway Transport owed such a non-delegable duty in turn depended on whether Freeway Transport was acting as a "common carrier" under applicable law.

The Mejia Action was bifurcated into liability and damages phases. On December 14, 2009, the court concluded the liability phase by ruling that Freeway Transport was acting as a common carrier and thus liable for the girl's injuries. At this point, Arch became actively involved in the Mejia Action and negotiated a "High-Low" agreement pursuant to which a cap of $22.5 million and a floor of $9 million were to be applied to any damages awarded against Freeway Transport in the damages phase. The jury for the damages phase ultimately awarded $24,307,273.56, which was then reduced to $22.5 million pursuant to the High-Low Agreement. Thereafter, Arch paid the $20.5 million of the judgment that exceeded the $2 million combined limit of Travelers's policies.

In the instant federal action, Arch by subrogation seeks reimbursement from Travelers of the $20.5 million it paid on behalf of their mutual insured, Freeway Transport, primarily contending that Travelers, in the course of its defense of the Mejia Action, unreasonably failed to settle that action. The California Supreme Court has recognized the existence of such a claim:

> It has been held in California and other jurisdictions that the excess carrier may maintain an action against the primary carrier for wrongful refusal to settle within the latter's policy limits. This rule, however, is based on the theory of equitable subrogation: Since the insured would have been able to recover from the primary carrier for a judgment in excess of policy limits caused by the carrier's wrongful refusal to settle, the excess carrier, who discharged the insured's liability as a result of this tort, stands in the shoes of the insured and should be permitted to assert all claims against the primary carrier which the insured himself could have asserted. Hence, the rule does not rest upon the finding of any separate duty owed to an excess insurance carrier.

Commercial Union Assurance Cos. v. Safeway Stores, Inc., 26 Cal. 3d 912, 917-18 (1980). An element of an insurer's equitable subrogation claim is that "justice requires that the loss be entirely shifted from the insurer to the defendant, whose equitable position is inferior to that of the insurer." Fireman's Fund Ins. Co. v. Maryland Casualty Co., 65 Cal. App. 4th 1279, 1292 (1998).

1    In particular, Arch here contends that Travelers failed to conduct adequate investigations regarding the facts material to the insured's liability (especially whether Freeway Transport was acting as a common carrier), failed to make reasonable attempts to settle the Mejia Action, failed to inform the insured of Travelers's analysis of the case or the impact of Travelers's decisions on the insured, and put its interests ahead of the insured by exposing the insured to the risk of an excess judgment.  By way of example, Arch claims that Travelers allowed to expire a Cal. Civ. Proc. Code § 998 offer ("998 Offer") to settle the Mejia Action for $2 million (which was within the combined limit of the Travelers policies) and failed to notify the insured of the settlement offer.  Arch contends that this was unreasonable in light of the serious and permanent nature of the girl's injuries and the potential liability of Freeway Transport.

On its part, Travelers generally contends that its handling of the Mejia Action was reasonable under the circumstances.  Pertinent to the instant motion, Travelers asserts that Arch was aware of the risks and exposures facing the insured and never objected to, and in fact agreed with, Travelers's handling of the defense and its decision not to settle the case prior to the liability determination.[2]

Background Facts Regarding the Discovery Dispute

This discovery dispute arises from Travelers's attempt to discover facts supporting a potential defense that Arch should be unable to recover from Travelers because Arch essentially agreed with Travelers's handling of the case.  In response to a document request by Travelers and subject to certain objections, Arch agreed to produce "copies of all unprivileged documents that evidence, reflect, or relate to Arch's evaluation of the potential liability of

---

[2]  Travelers also claims, *inter alia*, that it reasonably relied on the advice of counsel and that it was given inaccurate and incomplete information by Freeway Transport as to the material facts relating to liability and the existence of the Arch insurance policy.  For example, Travelers contends that plaintiff's 998 Offer was made by mistake and without knowledge of the Arch excess insurance policy and was therefore voidable.  However, because these additional defenses do not implicate Arch's conduct, they are not pertinent to the resolution of this motion.

Freeway Transport...and/or potential damages that might be awarded against [Freeway Transport] in the Mejia lawsuit...." (Dkt. No. 32-4 at 6.) One of the documents produced in response to this request was an e-mail by Arch employee Tom Houlihan to other Arch employees, which stated in part:

> I just wanted to alert you that we have raised the reserves to $100,000 on the above captioned claim based on the severity of the injuries. The plaintiff is an 11 year old girl with a serious de-gloving injury of the lower half of her body. Liability is very questionable, however, as the insured is only a broker, not a common carrier. However, there are some discrepancies noted by the plaintiff's attorney and this fact will have to be argued at trial.

(Dkt. No. 32-4 at 20.)

Subsequently, during the depositions of Mr. Houlihan and John Haluck, the attorney that was appointed by Travelers to represent the insured in the Mejia Action, Travelers attempted to solicit further information regarding this e-mail and any efforts by Arch to get Travelers to settle the Mejia Action prior to the liability determination. Although the deponents were allowed to answer, Arch's counsel continually objected that these questions were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. (Dkt. No. 32-2 at 2-5; Dkt. No. 32-4 at 23-31.) Since then, the parties have extensively met and conferred concerning the discoverability of information regarding Arch's conduct prior to the liability determination, particularly in regard to questioning at upcoming depositions, but have been unable to resolve the matter informally.

Consequently, Arch filed this motion for a protective order to preclude discovery by Travelers as to "Arch's conduct, including claims handling, monitoring, evaluation, assessment, and level of involvement" regarding the Mejia Action prior to the December 14, 2009 liability determination. Arch claims that such information is irrelevant to any party's claims and defenses and thus not reasonably calculated to lead to the discovery of admissible evidence. Furthermore, Arch contends that the discovery of such irrelevant information is wasteful and burdensome. For example, Arch asserts that Arch employee, Nora Deveau, one of

5

the principal claims adjusters for Arch during the pendency of the Mejia Action and whose deposition has been noticed by Travelers, recently gave birth to a child with serious health issues requiring time-consuming medical attention and is presently working a very reduced schedule. As such, Arch asserts that it wishes to avoid any unnecessary lengthening of that deposition, and preparation for the deposition, by inquiry into issues that are not germane to this case. Travelers disputes that this evidence is irrelevant, that the discovery imposes any burden, and contends that no protective order is warranted.

DISCUSSION

Fed. R. Civ. P. 26 provides, in part, that unless otherwise limited by court order, "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense...For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). However, "[o]n motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:...(iii) the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed. R. Civ. P. 26(b)(2)(C)(iii). As such, "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (A) forbidding the disclosure or discovery;...(D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters;...." Fed. R. Civ. P. 26(c)(1).

As the court observed at the hearing, although Arch makes much of the burden to Ms. Deveau in being deposed on the topics in dispute, Ms. Deveau's personal concerns and obligations can easily be addressed by stipulation (or if necessary, a court order) regarding

1  appropriate conditions and limitations on the deposition.  Rather, if any true burden exists, it is
2  by virtue of having to be deposed about irrelevant matter or having to respond to irrelevant
3  discovery requests.  "If discovery sought is not relevant, the court should restrict discovery by
4  issuing a protective order."  Ginena v. Alaska Airlines, Inc., 2011 WL 4749104, at *1 (D. Nev.
5  Oct. 6, 2011) (citing Roehrs v. Minnesota Life Ins. Co., 228 F.R.D. 642, 644 (D. Ariz. 2005) and
6  Herbert v. Lando, 441 U.S. 153, 177 (1979)).

7  It is well established, and the parties appear to agree, that an excess insurer has no
8  duty or right to participate in the defense of an action until the primary policy's limits are
9  exhausted.  See e.g. Community Redevelopment Agency v. Aetna Casualty & Surety Co., 50
10 Cal. App. 4th 329, 339 (1996) ("It is settled under California law that an excess or secondary
11 policy does not cover a loss, nor does any duty to defend the insured arise, until *all* of the primary
12 insurance has been exhausted"); Eaton Hydraulics Inc. v. Continental Casualty Co., 132 Cal.
13 App. 4th 966, 975 (2005) (accord); Del Real v. U.S. Fire Ins. Crum & Forster, 64 F. Supp. 2d
14 958, 965 (E.D. Cal. 1998) (accord); Continental Casualty Co. v. Royal Ins. Co. of America, 219
15 Cal. App. 3d 111, 119 (1990) ("The excess carrier has no duty or right to participate in the
16 defense, absent contract language to the contrary, until the primary policy limits are exhausted");
17 Continental Casualty Co. v. U.S. Fidelity & Guaranty Co., 516 F. Supp. 384, 392 (N.D. Cal.
18 1981) (holding that excess carrier has no duty to mitigate damages by attempting to settle the
19 action on its own given that the primary carrier controls the litigation).  Thus, any evidence
20 regarding Arch's failure to act or monitor the litigation prior to the exhaustion of the Travelers
21 policies (or prior to the liability determination) would be plainly irrelevant.

22 However, this case presents a slightly closer question.  Here, Travelers has put
23 forth some evidence (in particular, the e-mail from Tom Houlihan to other Arch employees) that,
24 despite having no duty to do so, Arch in fact made at least a cursory evaluation of the insured's
25 potential liability.  This evaluation arguably tends to suggest that Arch agreed with Travelers's
26 assessment of the case at the time of the e-mail.  Travelers argues that, because Arch's case

depends on proving that it was unreasonable for Travelers to conclude that Freeway Transport was not a common carrier and therefore not to settle the case prior to the liability determination, Arch's contemporaneous assessments of potential liability, uncolored by the benefit of hindsight, are probative of the reasonableness of Travelers's decisions – at least as probative as whatever after-the-fact arguments or expert opinions Arch may offer in the case.  It is unclear whether further such assessments or evaluations exist, and Travelers would like to probe the issue further in depositions and other discovery.

On its part, Arch contends that such discovery is foreclosed by Lexington Ins. Co. v. Sentry Select Ins. Co., 2009 WL 4132140 (E.D. Cal. Nov. 23, 2009), a case with strikingly similar facts.  In Lexington, the primary insurer Sentry sought reconsideration of a protective order precluding discovery of excess insurer Lexington's handling and monitoring of an underlying wrongful death action. Id. at *1.  As in the instant case, such discovery was aimed at developing a defense to Lexington's equitable subrogation claim against Sentry, which alleged that Sentry acted in bad faith in seeking to protect solely its own interests by, among other things, failing to accept reasonable settlement offers within Sentry's policy limits. Id. at ** 1-2.

More specifically, before the magistrate judge, Lexington had sought a protective order to preclude Sentry's discovery, through depositions, interrogatories, and document requests "as to Lexington's claims handling, monitoring and level of involvement regarding the [underlying] action prior to the jury verdict and whether Lexington agreed with Sentry's assessment prior to the jury verdict." Lexington Ins. Co., 2009 WL 4132140, at *2.  In granting the protective order, the magistrate judge stated:

> 1. Lexington's monitoring, handling, evaluation, decisions and conduct prior to exhaustion of Sentry's policy limits is irrelevant in that as an excess insurer, "Lexington owed no duty related to the [underlying] action unless and until the [Sentry] primary policy was exhausted. *Continental Casualty Co. v. Royal Ins. Co.*, 219 Cal.App.3d 111, 118-119, 268 Cal.Rptr. 193 (1990)";
>
> 2. "Lexington's internal handling of the claim related to its insureds Bear Trucking and Robert Knieling is not germane to a

      determination of whether or not Sentry breached its covenant of good faith and fair dealing to the same insureds as the primary carrier";

      3. Sentry failed "to articulate how Lexington's adjustment, monitoring, evaluation and valuation, and decisions and conduct regarding rejections on behalf of Bear Trucking, pre-trial settlement negotiations, trial negotiations, communications and reports regarding the [underlying] action, as well as Lexington's policies and procedures in place during the pendency of the [underlying] action, have any bearing on its *own duties* to its insureds" in that the "primary carrier controls the litigation";

      4. The "duty that is the subject of the litigation is *Sentry's* to its insureds, rather than any duty of Lexington"; and

      5. "[L]imiting Sentry's discovery to matters other than Lexington's handling of its own claim relative to the underlying [] action outweighs any likely benefit."  (Italics in original.)

Id. at ** 2-3. Subsequently, Sentry sought reconsideration of the protective order for, among other grounds, that the "requested discovery is relevant to the merits of Lexington's equitable subrogation claim, in particular, whether its position is inferior to Sentry's, the determination of which depends on whether Lexington internally agreed with Sentry's decision to try the underlying [] action." Id. at *3.

      The district judge denied Sentry's request for reconsideration, reasoning as follows:

> Sentry fails to explain how the information it seeks addresses the inferior position element of Lexington's equitable subrogation claim.  Lexington's agreement or disagreement to try the [underlying] action is of no consequence given Sentry's control of the [underlying] action up to the verdict and exhaustion of Sentry's policy limits.  *See Continental Casualty*, 516 F. Supp. at 392 (primary carrier's control of litigation renders improper excess carrier's interference, and excess carrier has no duty to contribute to settlement or defense until primary carrier's policy limits have been exhausted).  Although Lexington's potential agreement to try the [underlying] action may take some of the sting out of Sentry's decision to pursue a verdict, Sentry was the key decision maker to proceed to trial.  Lexington's pre-verdict conduct is irrelevant given Sentry's control of the [underlying] action as primary carrier.  Sentry demonstrated no clear error in [the magistrate judge's] determination that Sentry's discovery requests fail to support a defense to Lexington's equitable subrogation claim.

9

Lexington Ins. Co., 2009 WL 4132140, at *5.

Travelers contends that Lexington is inapposite, because the primary carrier in that case (Sentry) relied on "an entirely different theory of relevance" – in particular, that the excess carrier's conduct may be relevant to whether the excess carrier occupied a superior or inferior equitable position. By contrast, Travelers argues, its theory of relevance is much more straightforward – that Arch's own determination that liability was "very questionable" provides at least some evidence suggesting that Travelers acted reasonably in reaching the same conclusion. However, Travelers's distinction amounts to no more than semantics. Determining whether Travelers's equities are inferior to Arch's equities is simply a question of whether Travelers is at fault for causing the loss complained of in this case. In turn, whether Travelers is at fault, i.e. whether it breached its duties to the insured, is based on *Travelers's* conduct. See Lexington Ins. Co., 2009 WL 4132140, at *5. The Lexington court clearly held that the excess carrier's internal agreement or disagreement with the primary carrier's defense strategy, or its level of monitoring of the case, prior to exhaustion of the primary policy is irrelevant given the primary carrier's control of the litigation and the fact that such internal, undisclosed assessments and activities could not have influenced the primary carrier. Id. Furthermore, Travelers's argument that the analysis in Lexington was based solely on the excess carrier's lack of duty is without merit. The Lexington court plainly suggested that even if the excess carrier performs an internal assessment of the case, which it has no duty to make, such an assessment would still be irrelevant to whether the primary carrier breached its duties to the insured.

While Lexington is not binding authority, this court sees no reason to depart from its analysis, and Travelers offers no contrary authority addressing the discoverability of an excess carrier's internal assessments and activities.[3] For the reasons persuasively stated in Lexington,

---

[3] At oral argument, Travelers did point to a footnote in a California Court of Appeal case, Continental Casualty Co. v. Royal Ins. Co. of America, where the appellate court noted that the trial court attempted to exclude all evidence of the excess carrier's conduct prior to settlement of the claim, "except [the excess carrier's] evaluation of the case." Continental Casualty Co. v.

while one can conceive that another insurer's internal contemporaneous assessment may in some sense be relevant to the general subject matter of the litigation, it is irrelevant to the parties' claims and defenses. As noted in Lexington, the internal, undisclosed assessments and actions of the excess carrier could not have influenced the primary carrier's decisions. In essence then, discovery of such information and its use at trial amount to little more than an attempt to use the excess carrier's internal assessments as a type of "expert opinion" against itself. Moreover, as a policy matter, the probative value of excess carriers' internal assessments prior to exhaustion of the primary policies is further reduced by the fact that excess carriers are not in charge of the litigation, do not interact with the insured to the same extent as the primary carrier during the litigation, and therefore do not necessarily possess the same universe of facts regarding the litigation as the primary carrier. Additionally, given that the excess carriers are not subject to the same duties as the primary carrier prior to exhaustion of the primary policies, their internal assessments may well be more cursory than those of the primary carriers. As such, good cause does not exist to allow discovery of such information under a broader scope of discoverability as "matter relevant to the subject matter involved in the action." Fed. R. Civ. P. 26(b)(1).

      That said, to the extent that Arch actually communicated its evaluations and assessments of the underlying case to Travelers, the court finds that such information is discoverable.[4] This is because Arch would then have directly involved itself in the strategy for

---

Royal Ins. Co. of America, 219 Cal. App. 3d 111, 117 n.1 (1990). However, that case primarily concerned the non-discoverability of evidence regarding the excess carrier's failure to act, and the appellate court did not express an opinion one way or the other concerning the trial court's admission of the excess carrier's case evaluation. Indeed, it is unclear whether the assessment was an internal document or whether its admission into evidence was even challenged by the excess carrier in that case. As such, this court declines to give this isolated footnote significant weight and instead relies on Lexington, which explicitly addressed the issue.

    [4] The parties disagree as to whether Lexington allows for discovery of communications between the primary insurer and the excess insurer prior to the exhaustion of the primary policies. The parties' disagreement is based on their respective interpretations of the first footnote in that decision, which states: "Lexington does not challenge discovery as to its communications with Sentry or its internal handling, involvement and monitoring of the [underlying] action after the verdict." Lexgton Ins. Co., 2009 WL 4132140, at *2 n.1.

defense of the Mejia Action and would thereby have influenced, at least to some degree, Travelers's decisionmaking. Of course, for obvious reasons, it is unlikely that any such communications are not already in Travelers's possession, and it is unclear whether any even exist in this case. Nevertheless, Travelers should be entitled to explore the facts and circumstances surrounding any such communications further via deposition testimony or written discovery. Arch's internal assessments, evaluations, and conduct regarding the Mejia Action, however, are irrelevant to the parties' claims or defenses, not reasonably calculated to lead to the discovery of admissible evidence, and therefore not discoverable.[5]

CONCLUSION

       For the foregoing reasons, IT IS HEREBY ORDERED THAT:

       1. Arch's motion for a protective order (dkt. no. 31) is GRANTED IN PART.

       2. Travelers is precluded from conducting any discovery as to Arch's internal conduct, including internal claims handling, monitoring, evaluation, assessment, and level of involvement regarding the Mejia Action prior to the determination of the underlying insured's liability on December 14, 2009. Nothing in this order precludes Travelers from conducting

////
////
/////
////
////

---

Travelers disagrees with Arch's contention that the phrase "after the verdict" applies to the whole quoted sentence. While Arch's interpretation may be grammatically correct, the <u>Lexington</u> decision as a whole, with multiple references to "internal handling" and "internal, undisclosed evaluation," etc. suggests that external communications between the carriers are discoverable, at least those pertaining to evaluation and assessment of the underlying case and the strategy for defending it. However, the court express no opinion regarding the ultimate admissibility of such evidence, an issue which is not presently before the court.

    [5] Internal communications include communications among Arch employees as well as communications between Arch and its counsel.

discovery as to Arch's external communications with Travelers pertaining to evaluation and assessment of the Mejia Action and the strategy for defending it.[6]

IT IS SO ORDERED.

Dated: June 11, 2012

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

CKD/5
Travelers.1601.mpo.wpd

---

[6] It is unclear whether, or to what extent, resolution of the instant motion impacts Travelers's pending motion to compel noticed for hearing on June 20, 2012. (Dkt. No. 30.) To the extent this order resolves the issues raised in that motion, Travelers shall withdraw that motion – if not, the parties shall limit discussion in their joint statement to issues that have not already been resolved by this order.