UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| TRAVELERS INDEMNITY OF CONNECTICUT, et al, | ) ) | No. 2:11-CV-1601-JLQ |
| Plaintiffs, | ) ) | MEMORANDUM OPINION AND ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT |
| v. | ) ) ) | |
| ARCH SPECIALTY INSURANCE COMPANY, | ) ) | |
| Defendant. | ) ) | |

BEFORE THE COURT are cross-motions for summary judgment.  Plaintiffs Travelers Indemnity Company of Connecticut and Travelers Property Casualty Company of America (hereinafter "Travelers") have filed a Motion (ECF No. 89) seeking summary judgment on all claims, or in the alternative partial summary judgment.  Defendant and Counterclaimant Arch Specialty Insurance Company ("Arch") has filed a Motion for Partial Summary Judgment (ECF No. 87).  The parties filed Response and Reply briefs.  Oral argument was heard on November 14, 2013, in Riverside, California. John Brooks participated on behalf of the Plaintiffs Travelers.  Fred Heather and Aaron Allan appeared on behalf of the Defendant/ Counterclaimant Arch.  This Memorandum Opinion and Order memorializes and supplements the court's oral rulings.

**I.  Procedural History**

Travelers commenced this action by filing a one-count Complaint seeking a declaratory judgment pursuant to 28 U.S.C. § 2201(a).  Travelers alleged that an actual controversy existed between itself and Arch concerning the handling of a state court personal injury lawsuit.  Travelers sought a declaration that it had not

ORDER – 1

breached any duty to settle the action and that Travelers was not obligated to reimburse Arch for the amounts Arch contributed to the eventual post-verdict settlement. (ECF No. 1, ¶¶ 9-10).

Arch Answered (ECF No. 10) the Complaint admitting that it had contributed $20.5 million towards settlement of the underlying action, and that Travelers had contributed $2 million. Arch asserted several affirmative defenses and filed a Counterclaim. (ECF No. 11). Arch then filed a First Amended Counterclaim (ECF No. 15), which asserted four claims: 1) breach of the implied covenant of good faith and fair dealing; 2) tortious breach of the implied covenant of good faith and fair dealing; 3) breach of the duty of care; and 4) declaratory judgment. Travelers filed a Motion to Dismiss the breach of duty of care counterclaim and Motion to Strike claims for attorneys fees and punitive damages. (ECF No. 19 & 20). The court granted the Motions, dismissing one count of the counterclaim and the request for attorney fees and punitive damages. (ECF No. 25).

The parties proceeded with discovery and filed cross-motions for summary judgment. During the briefing on those motions, Travelers asserted that Arch had moved for summary judgment on bad faith theories that were not pled. The court addressed this issue with the parties on December 3, 2012, the time set for hearing on the summary judgment motions, and Arch orally moved to amend its Counterclaim, followed by a written Motion for Leave to Amend (ECF No. 64). The court granted the Motion for Leave to Amend, and Arch filed a Second Amended Counterclaim. (ECF No. 71).

The operative pleadings are Travelers' Complaint (ECF No. 1) and Arch's Second Amended Counterclaim (the "SAC") (ECF No. 71). The SAC contains three counts:   1) breach of the implied covenant of good faith and fair dealing; 2) tortious breach of the implied covenant of good faith and fair dealing; 3) declaratory judgment.

## II.  Factual Background

The instant dispute arises out of an underlying California state court personal injury action which the parties refer to as the Mejia action.  That case concerned a tragic set of circumstances where on November 27, 2004,  Simon Loza-Mejia, a truck driver, ran over his nine-year old daughter after he had stopped the truck on the side of the road to go to the bathroom.  Unbeknown to him, his daughter Diana, had also exited the truck to go to the bathroom.  When Mr. Mejia started to drive away, Diana was crushed under the wheels of the truck and sustained severe injuries. (ECF No. 90-1, p. 3-4).  Diana filed suit in the Superior Court of California, County of Sacramento in January 2006, against her father and Freeway Transport, a small business that arranges freight transportation.  Freeway Transport had arranged for Mr. Mejia to transport a load of produce from California to Oregon.  The theory of liability against Freeway Transport was that it was a common carrier, rather than a transportation broker, and was therefore vicariously liable for Diana's father's negligence. (*Id*. at 4).

Diana was represented in the Mejia action by Mark Swanson.  Travelers had issued a primary liability policy covering Freeway Transport with limits of $2 million. Arch had issued an excess liability policy with a limit of $24 million. Travelers hired attorney John Haluck to defend Freeway Transport (hereafter "FT"). In May 2006, Haluck filed a motion for summary judgment on behalf of FT arguing that FT was not liable as a matter of law for Diana's injuries as it was not a common carrier.   On June 2, 2006, FT served discovery responses to Diana's interrogatories that did not disclose the existence of Arch's excess policy.  On June 12, 2006, without knowledge of Arch's $24 million excess policy, Diana's counsel made a California statutory 998 Offer to settle the action for $2 million.  At that time FT's motion for summary judgment was pending and Haluck recommended to Travelers that FT reject the offer.  No counteroffer was made.

In October 2006, FT's motion for summary judgment on the issue of common

carrier liability was denied.  In November 2006, Haluck learned of the Arch excess policy and informed Diana's counsel, Swanson.  In November/December 2006, Travelers hired a law firm in Washington D.C. that specialized in transportation law to give an opinion on the common carrier aspect of the case.  In March 2007, Swanson informed FT that he was now associating with Dreyer Babich, Buccola & Callahm as counsel for Diana.  The parties describe Dreyer Babich as "one of the most high-powered personal injury firms in Northern California". (ECF No. 90-1, p. 21).  In April 2007, Travelers raised its liability reserve on Diana's claim to $2 million (the limit of Traveler's primary liability policy).  Both Travelers and Arch agree that when Dreyer Babich first entered the case, Dreyer Babich did not want to mediate because it wanted to conduct further research and discovery. (*Id.*).  The parties in the Mejia action then agreed to bifurcate the issue of FT's liability from the question of damages.  Liability would be determined first in a bench trial, and then, if necessary, damages would be tried to a jury.  Dreyer Babich filed an Amended Complaint in November 2007.  In February 2008, Travelers replaced defense counsel John Haluck with attorney Gary Ottoson.

On April 1, 2008, Dreyer Babich sent a letter to Ottoson which mentioned the subject of mediation.  On April 14, 2008, Dreyer Babich moved for summary judgment seeking to establish as a matter of law that FT was vicariously liable for Diana's injuries.  With Diana's Motion For Summary Judgment still pending, a mandatory settlement conference ("MSC") was set for August 2008.  Approximately one-week before the MSC, Ottoson asked Diana's counsel if there was any possibility of resolution within the $2 million limit, and was told no. (ECF No. 90-1, p. 25).  On August 5, 2008, Dreyer Babich filed a MSC statement which asserted "the reasonable value of this case is $15,000,000.00."  On August 6, 2008, Ottoson informed Travelers and Arch that Dreyer Babich had stated there was no possibility of settling within the $2 million limits, and that both counsel had come to the joint conclusion that not much would be accomplished at the MSC. (ECF No.

90-1, p. 30).  Also on August 6, 2008, Ottoson filed an MSC statement on behalf of
FT.  It made no mention of Diana's 998 Offer of settlement made in 2006, and
further stated: "Settlement Efforts: No efforts have been made by the remaining
parties to date." (ECF No. 92-1, ¶ 58).

On August 8, 2008, the California Superior Court issued an Order denying
Diana's Motion For Summary Judgment on the question of common carrier
liability.  The Order also stated: "It is also true that at this point at least the evidence
in favor of finding Freeway Transport to be the carrier appears more credible and
more significant that [sic] the evidence showing that Trucking was the carrier." (*Id.*
at ¶ 59).  The MSC occurred on August 12, 2008, and Travelers did not offer any
money in settlement. (*Id.* at ¶ 63).  The MSC lasted only 15 to 20 minutes, and
Diana did not make a demand. (ECF No. 90-1, ¶ 55).  Arch and Travelers agree that
as of the date of the MSC in August 2008, the liability of FT remained uncertain
and Diana faced a risk of recovering nothing from FT. (ECF No. 92-1, ¶ 66).

On August 22, 2008, a conference call took place that included Ottoson, a
Travelers' claims adjuster, a claims adjuster from Arch, and Arch's monitoring
counsel.  The parties dispute what was said on this conference call.  Particularly, the
parties dispute whether Arch was asked to contribute to a settlement, and if so, the
response that Arch gave.  Approximately one year later, in September 2009, after a
deposition, Ottoson asked Diana's counsel for a settlement number.  Diana's counsel
responded that he still didn't know what the case was worth, wasn't ready to make a
demand, and the only demand he'd be willing to make "would be a number you'd
never pay." (ECF No. 90-1, ¶ 77).

The common carrier liability issue was tried in a bench trial in September
2009.  In December 2009, the court issued its ruling finding that FT had acted as a
common carrier rather than a broker and was vicariously liable for Diana's injuries.
(ECF No. 92-1, ¶ 83).  Prior to the court ruling on liability, Travelers had never
offered its $2 million primary limit.  Arch had never demanded that Travelers offer

ORDER – 5

1   its $2 million limit or tender its $2 million limit to Arch. (ECF No. 90-1, ¶ 81).

2   After the liability finding, in late-December 2009, Travelers authorized $2 million

3   in settlement authority, and that offer was conveyed to Diana's counsel in January

4   2010.  Prior to making the $2 million offer in January 2010, no monetary settlement

5   offer had ever been made by Travelers to the plaintiff on FT's behalf. (ECF No. 92-

6   1, ¶ 90).  Diana did not respond to the $2 million offer, and a mediation was

7   arranged while at the same time the parties were preparing for the jury trial on

8   damages.

9       Ultimately, during the trial on damages, the parties reached a high-low

10  settlement agreement that provided Diana would receive at least $9 million, but no

11  more than $22.5 million, depending on the jury's verdict.  The jury returned a

12  verdict of $24.3 million, and Arch and Travelers, pursuant to the settlement

13  agreement, paid Diana $22.5 million (with Travelers paying $2 million and Arch

14  paying $20.5 million).

15  **III.  Discussion**

16    A.  **Traveler's Arguments in Support of Summary Judgment**

17      Travelers argues that the court should rule that Arch has no claim or cause of

18  action against Travelers based on Travelers' rejection of the $2 million 998 Offer

19  that was made in June 2006 prior to Diana's counsel being informed of the $24

20  million Arch policy.   Further, Travelers seeks a determination from the court that

21  Arch has no claim against Travelers based on a failure to negotiate or pursue

22  settlement opportunities, including that associated with the August 2008 MSC.

23  (ECF No. 89, p. 2).  Travelers argues that the $2 million 998 settlement offer was

24  based on false interrogatory responses, verified by Teresa Spada, a principal of FT,

25  and that therefore the $2 million offer was improperly induced, would not have

26  been approved at a minor settlement hearing, and, if approved by the court, Diana's

27  counsel would have moved to set it aside upon learning of the Arch excess policy.

28  Concerning the 2008 Mandatory Settlement Conference, Travelers further argues

ORDER – 6

that the $15 million valuation in Diana's written pre-mediation filing was not a demand.  Travelers contends that Diana never made a demand between the initial $2 million 998 Offer in June 2006 and the determination of liability in December 2009. Travelers contends Dreyer Babich's position was that they were not ready to settle because they were assessing Diana's medical condition--the permanancy of her injuries and prognosis.

Travelers further contends that Arch declined to contribute to settlement in an August 2008 conference call. (ECF No. 89-1, p. 6).  Travelers primary position is that there was never an opportunity to settle prior to the liability determination because Diana never made a demand.  Secondarily, if the $15 million written pre-mediation statement by Dreyer Babich is construed as a demand, Travelers contends it conveyed the demand to Arch and Arch was not willing to contribute.

Travelers additionally argues that under California law, there can be no duty on the insurer's part to settle, in the absence of a demand.  Finally, Travelers argues that if Arch could establish a breach of duty to settle, Arch could not produce  non-speculative evidence of damages.

## B.  Arch's Arguments in Support of Summary Judgment

Arch argues that it is entitled to a determination as a matter of law that Travelers committed bad faith by not offering to pay out its $2 million primary insurance policy limits, or otherwise attempting to settle, in response to two alleged settlement opportunities: 1) a mediation proposal by Diana in April 2008, and 2) Diana's $15 million mandatory settlement conference statement. (ECF No. 87, p. 5). Arch further contends that Travelers engaged in bad faith concerning the 998 Offer in 2006 by failing to inform the insured of the 998 Offer and failing to respond to the Offer.

Arch concedes that it is not entitled to summary judgment concerning bad faith in the handling of the 998 Offer.  Arch states that questions raised by the court at the prior summary judgment hearing demonstrate that "factual issues exist"

ORDER – 7

1    concerning that claim. (ECF No. 87, p. 7).

2         **C.  <u>Summary Judgment Standard</u>**

3         The purpose of summary judgment is to avoid unnecessary trials when there

4    is no dispute as to the material facts before the court. *Northwest Motorcycle Ass'n v.*

5    *U.S. Dept. of Agriculture*, 18 F.3d 1468, 1471 (9th Cir. 1994).  The moving party is

6    entitled to summary judgment when, viewing the evidence and the inferences

7    arising therefrom in the light most favorable to the nonmoving party, there are no

8    genuine issues of material fact in dispute. Fed. R. Civ. P. 56; *Anderson v. Liberty*

9    *Lobby, Inc.*, 477 U.S. 242, 252 (1986).  While the moving party does not have to

10   disprove matters on which the opponent will bear the burden of proof at trial, they

11   nonetheless bear the burden of producing evidence that negates an essential element

12   of the opposing party's claim and the ultimate burden of persuading the court that

13   no genuine issue of material fact exists. *Nissan Fire & Marine Ins. Co. v. Fritz*

14   *Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  When the nonmoving party has

15   the burden of proof at trial, the moving party need only point out that there is an

16   absence of evidence to support the nonmoving party's case. *Devereaux v. Abbey*,

17   263 F.3d 1070, 1076 (9th Cir. 2001).

18        Once the moving party has carried its burden, the opponent must do more

19   than simply show there is some metaphysical doubt as to the material facts.

20   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

21   Rather, the opposing party must come forward with specific facts showing that

22   there is a genuine issue for trial. *Id*.

23        Although a summary judgment motion is to be granted with caution, it is not

24   a disfavored remedy: "Summary judgment procedure is properly regarded not as a

25   disfavored procedural shortcut, but rather as an integral part of the Federal Rules as

26   a whole, which are designed to secure the just, speedy and inexpensive

27   determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327

28   (1986)(citations and quotations omitted).

**D.  The 998 Offer of $2 Million in June of 2006**

The first question of bad faith, is whether Travelers acted in bad faith by failing to accept the $2 million Offer made pursuant to California Code of Civil Procedure § 998 (hereafter "998 Offer").  At the time the 998 Offer was made, John Haluck was the attorney hired by Travelers to defend the action, and he advised Travelers representatives not to accept the 998 Offer.  Arch was not aware of the 998 Offer at the time it was made.  There is a dispute of fact as to whether the insured, FT, was informed of the 998 Offer through Teresa Spada.  Travelers did not directly inform Spada of the offer and Spada claims she was unaware of it.  However, Haluck met with Spada in late-June 2006, during the time when the 998 Offer was open, in order to prepare her for deposition.  Haluck's testimony was that it would have been his custom and practice to discuss the 998 Offer with the insured and that he had a vague recollection of discussing it with Ms. Spada.  (Haluck Depo. p. 86-87).

Under California law, an insurer has a "good faith duty to accept a settlement." *Gibbs v. State Farm*, 544 F.2d 423, 426 (9th Cir. 1976).   The insurer "must settle when there is a danger of high recovery." *Id.*  If there is a "great risk of recovery beyond the policy limits" the insurer must attempt to settle within limits. *Id.*  "[W]hether or not an insurer is guilty of bad faith is ordinarily a question of fact." *Highlands Ins. Co. v. Continental*, 64 F.3d 514, 517 (9th Cir. 1995).   "[A]n insurer negotiates in bad faith when it refuses settlement offers that are both within policy limits and reasonable.  An offer of settlement within policy limits is reasonable when there is a substantial likelihood that a jury verdict will be beyond those limits." *Id.*

California Model Civil Instruction CACI 2334 provides that a settlement demand is reasonable if the defendant, in this instance Travelers, "knew or should have known at the time the settlement demand was rejected that the potential judgment was likely to exceed the amount of the settlement demand based on

1    [Diana's] injuries or loss and probable liability."

2          The difficulty in assessing the claims herein, is that the determination of bad

3    faith is not an exact science.  Several courts have recognized the ambiguity of

4    assessing good and bad faith.  The district court in *Fidelity Guaranty v. Reddy*,

5    2008 WL 2441096 (E.D. Cal. 2008) referred to bad faith as "an amorphous

6    concept" where the "trier of fact must undertake a wide-ranging inquiry into such

7    intangibles as motive, knowledge, experience, and the ability to prophesy." *Id.* at

8    *5.  Similarly, the Ninth Circuit in *Allen v. Allstate Ins. Co.*, 656 F.2d 487 (9th Cir.

9    1981) stated:  "What is good faith or bad faith on an insurer's part has not yet

10   proved susceptible to pat legal definition." *Id.* at 489.  The question is "essentially a

11   matter of fact." *Id.*  More than negligence is required for a finding of bad faith. See

12   *Fidelity Guaranty v. Reddy*, 2008 WL 2441096 *6 (E.D. Cal. 2008)( "bad faith and

13   negligence are not legally synonomous"); CACI 2330 ("It [bad faith] is not mere

14   failure to exercise reasonable care.")

15         Travelers argues that it is entitled to summary judgment on the 998 Offer

16   theory of bad faith liability because it is undisputed that FT's discovery responses

17   were false and failed to disclose the Arch excess policy and Diana would not have

18   settled for $2 million had she known of the excess policy. (ECF No. 95, p. 5).

19   Travelers argues that it is not relevant who was at fault for the false interrogatory

20   response, but rather just that it was false.  Travelers relies on the declaration of

21   Mark Swanson, who was Diana's counsel at the time, that the $2 million demand

22   was induced by the false response, that he would not have made the offer if he knew

23   of the Arch policy, and that he would have moved to set it aside if accepted and

24   approved.   Arch objects to the testimony of Swanson as speculative.  The court has

25   previously overruled that objection. See Order of November 4, 2013 (ECF No.

26   105).

27         Arch argues that the incorrect discovery response was more attorney

28   Haluck's fault than it was Teresa Spada's. (ECF No. 90, p. 9)("In short, Travelers

ORDER – 10

and Haluck caused these inaccurate discovery responses–not Ms. Spada."). Arch disputes that FT had an obligation to correct the deficient discovery responses. *Id.* Finally, Arch also argues that even assuming Ms. Spada "acted inappropriately with respect to verifying Haluck's discovery responses, that would still not excuse Travelers' bad faith claims handling conduct." *Id.*

Arch additionally argues that had the $2 million 998 Offer been accepted and the matter proceeded to a minor settlement hearing, the Arch excess policy may not have been discovered at that hearing. Arch questions, in the event of discovery of the excess policy, "whether the plaintiff would have moved to set aside a $2 million settlement upon learning of the Arch policy, given the risk of an adverse liability determination and a zero recovery?" (ECF No. 90, p. 15).

Arch is proceeding under a theory of equitable subrogation. Arch, as the excess carrier, is equitably subrogated to the rights of the insured [FT] against the primary carrier [Travelers]. The question becomes whether FT, which verified interrogatory responses through Ms. Spada that failed to disclose Arch's excess policy, was entitled to benefit from that false response. "In subrogation litigation in California, the doctrine of superior equities is critical in determining whether a right of subrogation exists." *Dobbas v. Vitas*, 191 Cal.App.4th 1442, 1452 (2011). "Under the doctrine of equitable subrogation, the duty owed an excess insurer is identical to that owed the insured. The excess will not be able to force the primary into accepting any settlement which his duty to the insured would not require accepting." *Northwestern Mut. Ins. Co. v. Farmers' Ins. Group*, 76 Cal.App.3d 1031, 1045 (1978) citing *Peters v. Travelers Ins. Co.*, 375 F.Supp. 1347 (C.D. Cal. 1974).

In *Dobbas*, the insured had two excess policies issued by CalFarm and American Guarantee. The CalFarm policy had lapsed, allegedly due to the fault of the insurance broker. American Guarantee argued it would not have been forced to pay, had the CalFarm policy remained in effect. The court stated, "this erroneous

argument is based upon the apparent assumption that no one would have discovered the American Guarantee policy if the CalFarm excess policy had been in place." *Id.* at 1453.    The court stated that "factual possibility" did not change American Guarantee's legal position: "Had the CalFarm excess policy been in place, American Guarantee still would have been legally responsible for its pro rata share of damages." *Id.*

   Similarly here, Arch had contracted with FT to provide an excess insurance policy.  No one disputes that the policy covered the accident involving Diana.  Arch was obligated to perform pursuant to the terms of the contract.  The fact that Arch can point to various factual possibilities under which through inadvertence or malfeasance its policy may have gone undiscovered in the Mejia action does not change Arch's legal obligation.  Concerning the 998 Offer, the court cannot find that Arch is in a superior equitable position.  Arch's theory relies on an injured nine-year old girl being fraudulently or negligently mislead as to the amount of insurance coverage.  It further relies on the Arch policy not being discovered at a minor settlement hearing, and FT not coming forward before the settlement is approved to correct or supplement its discovery responses.  Lastly, Arch's scenario requires that once the policy was discovered, the court would not set aside the minor settlement approval assuming initial approval. Under California equitable subrogation law, Arch stands in the position of the insured, FT, and FT verified false interrogatory responses which failed to disclose Arch's excess policy.  FT is not entitled to benefit from the false responses, and Arch proceeding under a theory based on equity is not entitled to benefit from the false responses.

   Arch may not base its theory of recovery solely on an argument that Travelers acted in bad faith by failing to accept the June 2006, 998 Offer of settlement for $2 million.  However, the court is inclined to allow the facts surrounding the 998 Offer to be presented to the jury.  The jury may consider the 998 Offer as part of the totality of the circumstances concerning Travelers' handling of the claim.  Further,

ORDER – 12

Travelers has argued in its briefs and orally to the court that it never received an offer within the policy limits.  Arch should be allowed to present evidence concerning the 998 Offer so that the jury is not given the mistaken impression that there never was an offer from Diana.

### E.  Travelers' Conduct After the 998 Offer and Specifically in 2008

Arch contends that Travelers acted in bad faith in 2008 when it did not make an offer to settle the case, or tender its primary policy limits to Arch, in response to a mediation conference statement that the case valuation was $15 million. Travelers contends that it never had the opportunity to settle within its $2 million policy limits at any time after the initial 998 Offer.  Travelers also argues that the $15 million MSC Statement was not a "demand".  Travelers position is that it could not have breached the duty of good faith because it did not receive an offer.

This court finds that Travelers had a duty to attempt to effectuate settlement once liability became reasonably clear, and once it was reasonably clear that a verdict would exceed the $2 million policy limits, even in the absence of a formal settlement demand from Diana.  California case law, and the California Insurance Code speak of a "duty to effectuate settlement".  It is not merely a duty to accept reasonable settlement offers.  "Effectuate" means "to put into force or operation." Oxford on-line Dictionary at www.oxforddictionaries.com last visited November 21, 2013; see also www.dictionary.com citing to Random House Dictionary("to bring about") and Collins English Dictionary ("to cause to happen").  Therefore,  to act in good faith, and to attempt to effectuate settlement, Travelers was required to do something in an attempt to bring about a settlement.  The 998 Offer was received in June 2006.  The California state trial court determined FT was liable in December 2009.  In the intervening three years, Travelers did not make a single offer to settle the case.

A three-judge panel of the United States Court of Appeals in the original opinion in *Du v. Allstate*, 681 F.3d 1118 (9th Cir. 2013), stated that it was

ORDER – 13

addressing the "central legal issue" of: "Does an insurer have a duty, after liability of the insured has become reasonably clear, to attempt to effectuate a settlement in the absence of a demand from the claimant?" *Id.* at 1122. The Ninth Circuit then addressed the relevant California authorities and concluded: "We hold that, under California law, an insurer has a duty to effectuate settlement where liability is reasonably clear, even in the absence of a settlement demand." *Id.*

After the *Du* opinion was issued, motions for rehearing were filed, and several amicus briefs were submitted on behalf of insurance companies. The Ninth Circuit issued an amended opinion, at 697 F.3d 753, which stated it need not resolve the issue concerning a duty to effectuate settlement in the absence of a demand–despite having previously described that question as the "central legal issue". The three-judge panel did not repudiate its prior analysis, but rather merely withdrew it as unnecessary. Thus, the original Du opinion, *Du v. Allstate*, 681 F.3d 1118 (9th Cir. 2013), is not controlling precedent, but the court finds it highly persuasive.

The Ninth Circuit has previously stated, applying California law, that the duty to effectuate is more than merely the duty to accept. In *Pray v. Foremost Ins. Co.*, 767 F.2d 1329, 1330 (9th Cir. 1985), the court stated that California courts would impose a duty on an insurer to "attempt to settle a claim **by making**, and by accepting, reasonable settlement offers once liability has become reasonably clear." (emphasis added). Recently, the Ninth Circuit stated that California Insurance Code Section 790.03(h)(5) "which identifies as an unfair claims settlement 'not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear,' has been construed as extending the duty to settle beyond mere acceptance of a reasonable demand." *Du v. Allstate Ins. Co.*, 697 F.3d 753, 757 (9th Cir. 2012). In *Gibbs v. State Farm*, 544 F.2d 423 (9th Cir. 1976), applying California law, the Ninth Circuit found that a written formal offer to settle was not required: "Though no formal, written offer

ORDER – 14

existed, the jury could find that Gibbs' statements gave State Farm a reasonable opportunity to settle the claim within the policy limits." *Id.* at 427.

California state courts have recognized this as well.  In *Boicourt v. Amex Assurance Co.*, 78 Cal.App.4th 1390 (2000), the California Court of Appeal held that "a formal settlement offer is *not* an absolute prerequisite to a bad faith action in the wake of an excess verdict when the claimant makes a request for policy limits and the insurer refuses to contact the policyholder about the request." *Id.* at 1399.  It is not necessary that there be a formal written settlement demand, rather the inquiry is whether the insurer refused in bad faith a reasonable opportunity to settle.  In *Reid v. Mercury Ins. Co.*, __Cal.Rptr.3d__, 2013 WL 5517979 (Oct. 7, 2013), the court stated: "For bad faith liability to attach to an insurer's failure to pursue settlement discussions, in a case where the insured is exposed to a judgment beyond policy limits, there must be, at a minimum, some evidence either the injured party has communicated to the insurer an interest in settlement, or some other circumstance demonstrating the insurer knew that settlement within policy limits could feasibly be negotiated." (Slip Op. 9).  Once again, this language is broader than merely a duty to accept a settlement demand.  The court speaks of pursuing settlement discussions, communication of an interest in settling, or knowledge that a within policy limits settlement was possible.  The *Reid* court does however disclaim the notion that an insurer has a duty to initiate settlement discussions.  The *Reid* court also disagrees that California Insurance Code 790.03(h)(5) imposes an affirmative duty to settle.   The *Reid* court concludes that bad faith may occur, without a formal settlement offer, if "the insurer ignores the opportunity to explore settlement possibilities to the insured's detriment, or when an insurer has an arbitrary rule or engages in other conduct that prevents settlement opportunities from arising." (Slip. Op. 17-18).  However, an opportunity to settle does not arise "simply because there is a significant risk of an excess judgment." (*Id.* at 18).

Travelers relies on *Merritt v. Reserve Ins. Co.*, 34 Cal.App.3d 858 (1973) and

*Coe v. State Farm Mut. Auto Ins. Co.*, 66 Cal.App.3d 981 (1977) to argue that California law requires a settlement demand in order for the insurer to be found liable for bad faith in refusing to settle.  This argument is flawed both legally and factually.  Legally, this argument was rejected by a three-judge panel of the Ninth Circuit Court of Appeals in the original *Du* opinion.  The Du court found that the defendant insurance companies' reliance[1] on *Merritt* and *Coe* was "misplaced". *Du v. Allstate*, 681 F.3d 1118, 1123 (9th Cir. 2012).  The court went on to say that the Merritt court's "refusal to find bad faith therefore rested not on any categorical rule that there is no legal duty to initiate settlement, but on the facts of that case," which were that any settlement overtures would have been futile. *Id.* at 1124.  As to the *Coe* case, the Ninth Circuit found that its broad language concerning failure to accept settlement was dicta and not consistent with more recent California case law. *Id.*  Although the Ninth Circuit withdrew and amended its original *Du* opinion, this court. as stated *supra*, finds the reasoning persuasive.

Factually, Travelers argument is also incorrect.  Travelers states, "[t]he simplest ground to grant summary judgment is that Diana made no settlement demand before the liability trial." (ECF No. 95, p. 5).  This is incorrect and ignores the 998 Offer of June 2006.  Although that offer was based on false or incomplete information, it nonetheless indicated a willingness on Diana's part to engage in settlement discussions.

Arch contends that Travelers missed many opportunities to settle.  Chiefly among them, were failing to make a counteroffer to the 998 Offer, failing to respond to an April 2008 letter from Diana's counsel which mentioned mediation, and failing to make a counteroffer to the $15 million valuation in the MSC statement.  The question of bad faith in this case is for the jury.  The jury will consider whether reasonable opportunities to settle existed and whether Travelers

---

[1]The defendants in *Du v. Allstate* were represented on appeal by John T. Brooks, who is also counsel for Travelers herein.

ORDER – 16

acted in bad faith by ignoring the opportunities to the detriment of the insured.

### IV. Conclusion

The question of what constitutes bad faith on the part of an insurer is ordinarily and essentially a question of fact.  This case also involves questions of reasonableness, that are to be determined by the trier of fact.  The court cannot find as a matter of law that Travelers did not breach the duty to act in good faith by failing to effectuate settlement.  The court also does not find as a matter of law that Arch is entitled to summary judgment determination that Travelers did breach the implied covenant of good faith and fair dealing.

The court does find as a matter of law that Arch cannot base its bad faith claim *solely* on the rejection of the $2 million 998 Offer in 2006.  To allow Arch to recover $20.5 million on the basis that Travelers was required in good faith to accept the 998 Offer would be inequitable, for the reasons stated herein.  However, as stated above, the court is inclined at this point, to allow the jury to consider the rejection of the 998 Offer and attendant circumstances then existing (including the non-disclosure of the Arch policy; the pending summary judgment motion filed by Haluck; whether Ms. Spada was informed of the offer, etc.) in assessing the totality of the circumstances.  To keep the 998 Offer from the jury would allow Travelers to continue to argue that it never received an offer to settle, which would be inaccurate.  The parties can address this issue further via motions in limine if they so choose.

The court also concludes as a matter of law, that under California law, the duty of an insurer to effectuate settlement requires more than merely doing nothing while awaiting a formal written settlement demand.  The insurer must act in good faith in response to reasonable opportunities to settle.  Although Travelers was not required to accept the 998 Offer, a jury could find that the 998 Offer presented a reasonable opportunity to pursue settlement.  Additionally, a reasonable jury could find that Diana's MSC statement in August 2008 that "the reasonable value of this

case is $15,000,000.00", presented a reasonable opportunity to pursue settlement of the case and that Travelers' failure to pursue settlement discussions at that point constituted bad faith.

**IT IS HEREBY ORDERED**:

1.  Travelers' Motion for Summary Judgment (ECF No. 89) is **DENIED in PART and GRANTED in PART**.  The Motion is denied except to the extent that Arch cannot base its bad faith claim <u>solely</u> on Travelers' refusal to accept the $2 million 998 Offer.

2.  Arch's Motion for Partial Summary Judgment (ECF No. 87) is **DENIED**.

**IT IS SO ORDERED**.  The Clerk shall enter this Order and furnish copies to counsel.

DATED this 26th day of November, 2013.

s/ Justin L. Quackenbush
JUSTIN L. QUACKENBUSH
SENIOR UNITED STATES DISTRICT JUDGE

ORDER – 18